IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SCOTT G. DOBOS, | ) | CASE NO. 4:16CV2381 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| HOWLAND LOCAL SCHOOLS BOARD | ) | |
| OF EDUCATION, *et al*., | ) | |
| | ) | |
| Defendants. | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |

Plaintiff Scott Dobos was a maintenance worker employed by Defendant Howland Local Schools Board of Education ("Board"). He alleges that, after a series of disciplinary meetings and hearings, he was forced to resign by Defendant Superintendent Kevin Spicher ("Spicher"). He has brought a procedural due process claim pursuant to 42 U.S.C. § 1983 against the Board and Spicher (collectively "Defendants"), asserting that the pre-termination process he received was constitutionally defective. Defendants assert that Dobos resigned voluntarily and that he received due process.

Defendants have filed a motion for summary judgment, Dobos filed an opposition brief, and Defendants replied. For the reasons explained below, while there is a question of fact as to whether Dobos resigned voluntarily, there is no genuine issue of material fact regarding Dobos's due process claim because Dobos cannot show he was denied adequate pre-termination process. Therefore, Defendants are entitled to summary judgment.

## I. Background facts

Dobos started working at Howland Schools full time as a maintenance worker in January 2000, after spending two years at Howland as a substitute maintenance worker. Doc. 26-2, p. 15

1

(Dobos deposition). During his time at Howland he reported to Jeff McVicker, but he was not actively supervised. Id., p. 26; Doc. 26-3, p. 13 (Keith Spicher's deposition).

In November 2015, the Board hired Superintendent Spicher's brother, Keith Spicher (hereinafter "Keith"), to be Operations Supervisor.[1] Doc. 26-3, p. 7; Doc. 16-2, pp. 36-37. As Operations Supervisor, Keith became the supervisor of all maintenance staff. Doc. 26-3, p. 7. The maintenance workers, including Dobos, were unhappy with the change because they had never been closely supervised before. Doc. 26-3, p. 13. Dobos was also unhappy because he had applied for the supervisor job but the Board hired Keith instead. Doc. 26-2, p. 32.

After Keith was hired, Dobos applied for the job "Maintenance II" worker and was hired for that position, effective on or about December 14, 2015. Id., p. 30. Dobos wanted the Maintenance II position because he believed this position would not require long hours, nor would it require him to be on call as he previously had been. Id. pp. 24, 30-32.

### A. The missing sink parts[2]

On December 21, 2015, Keith was asked to sign an "OK to PAY" invoice for a computer board that Dobos had ordered. Doc. 26-2, p. 184. Keith contacted Dobos to confirm that the part had been received. Id. Dobos initially did not remember if it had been received; he then remembered that it had been. Id. Keith asked him where it was and pointed out that Dobos had ordered five of the same parts on three separate occasions between March and December 2015. Id.; Doc. 26-2, pp. 83, 92; see also Doc. 26-2, pp. 186-188 (invoices). The total cost of these parts was roughly $2,900. Id. Dobos explained that the parts were for the sinks in the high school. Doc. 26-2, p. 184. He told Keith that he did not know where any of the parts were but

---

[1] For the sake of clarity, the Court refers to Operations Supervisor Keith Spicher as "Keith" and Defendant Superintendent Kevin Spicher as "Superintendent Spicher" or "Spicher."

[2] The parties and the Court interchangeably refer to "sink parts" and "computer boards." Computer boards are used to control the operation of the sprayers in the faucets of restroom sinks. Doc. 26-2, p. 84.

that he would get back to him.  Id.  When Keith asked him why he kept ordering the parts when they had never been installed, Dobos had no answer and could not remember if they had been installed or not.  Id.

Dobos admits that, between December 21, 2015, and February 5, 2016, he did not attempt to provide any information to Keith about the location of the five missing sink parts. Doc. 26-2, p. 92.

## B. January 5, 2016, disciplinary meeting

On December 21 and/or December 22, 2015, Keith met with maintenance workers and explained that they would be installing projectors in classrooms during the school holiday break. Doc. 26-3, pp. 18-19.  Keith asked the workers if they had any other projects planned over the break and "nobody said anything."  Doc. 26-3, p. 19.  Dobos recalls that he told Keith that he had some other projects to do and that he would "get to" the projectors.  Doc. 26-2, p. 38.  Dobos started working on the projectors two days after the meeting.  Id.  He did not understand Keith to say that the workers should start installing the projectors immediately.  Id.

On December 30, 2015, Keith sent Dobos a letter informing him that a disciplinary meeting would take place in Keith's office on January 5, 2016, to discuss "events that took place on December 21 and December 22, 2015, whereby you were assigned to install projectors." Doc. 26-2, p. 172.  Discussion items were listed as the failure to carry out directives as assigned and the failure to communicate rationale for deviating from the assigned directives.  Id.  Dobos was instructed to have a union representative accompany him.  Id.[3]  According to Keith, at the meeting, Dobos indicated that he did not understand the assignment and Keith gave him a verbal warning.  Doc. 26-3, p. 21; Doc. 26-2, p. 173.  According to Dobos, he was "shocked" that Keith alleged he failed to follow directives and that Keith was mistaken about whether Dobos failed to

---

[3] Dobos was a union member.  The union had a collective bargaining agreement ("CBA") with the school district which, among other things, provided procedures to be followed with respect to disciplining employees.

communicate his rationale for deviating from the directives "because [Keith] knew what I was doing." Doc. 26-2, pp. 39-40. Dobos did not believe Keith had issued him a verbal warning; rather, he believed that the verbal warning portion of the disciplinary process was dismissed because everyone understood it was a misunderstanding. Doc. 26-2, p. 41.

During the meeting, Dobos and his union representative, Tammy Heslop, made it clear to Keith that Dobos no longer wanted to have anything to do with the boilers now that he was a Maintenance II employee. Doc. 26-2, pp. 46, 174. Additionally, Keith told Dobos to complete his work orders and report to his supervisor after completing each order. Doc. 25-2, p. 1, ¶2.

### C. The boiler incident

A wrestling tournament was held at Howland over the January 16, 2016, weekend. Doc. 27, p. 19. On the morning of Saturday the 16th, Keith got a call informing him that there was no heat in the school. Id.; Doc. 26-3, p. 26. He called an HVAC company to come to the school to investigate. Doc. 26-3, p. 26. The HVAC workers told Keith that the boilers had been shut down. Id. Keith informed the Superintendent and told an IT worker to review camera footage of the boiler room. Id., p. 27. The camera footage showed Dobos entering the boiler room and coming out a few moments later. Id. The camera evidence was turned over to the Superintendent.

### D. February 1, 2016, fact finding meeting

Based on the above evidence regarding the boiler incident, Defendants scheduled a fact-finding meeting for February 1, 2016. Doc. 25-1, p. 1, ¶3. Dobos understood that the meeting "probably" had something to do with the boilers being shut down based on a paper he received prior to the meeting "that probably said something about the boilers." Doc. 26-2, pp. 62-63. He also had a conversation with union representatives before the meeting. Doc. 26-2, p. 62. At the meeting, Dobos was present with union representatives Heslop, Ruth Rule and Bill Padisak.

Doc. 26-2, pp. 39, 59, 177 (minutes of meeting).  When asked whether he shut the boilers down prior to the tournament weekend or knew anything about the boilers being shut down, Dobos denied any knowledge.  Doc. 26-2, p. 59, 177.  Superintendent Spicher concluded the meeting by informing Dobos that the district would continue to investigate and would review camera footage.  Id.

Five to fifteen minutes after the meeting ended, Dobos returned to the meeting site and told the Superintendent, "I did it."  Doc. 26-2, pp. 67 (Dobos deposition), 178 (minutes of meeting, Exhibit F to Dobos Deposition).

**E. February 5, 2016, pre-disciplinary hearing**

By letter dated February 3, 2016, Superintendent Spicher informed Dobos that he was required to attend a pre-disciplinary hearing on February 5.  Doc. 26-2, p. 179 (letter).  The letter informed Dobos that there were allegations being made against him following the conclusion of the February 1st hearing.  Id.  The letter set forth the allegations to be discussed at the meeting and informed Dobos that he would have an opportunity to respond to the allegations at the pre-disciplinary meeting and share his side of the story.  Id.  The letter informed him that, depending on how the meeting went, disciplinary action might be taken, including reprimand, unpaid suspension or termination.  Id.  The allegations set for discussion included insubordination (for failing to follow directives to no longer work on or be near the boilers and failing to notify supervisor of a deviation from an assigned work order); failing to notify appropriate school personnel that he shut down the boilers; intentional subversion; and complicity to cover-up/mislead investigators during the first meeting.  Id.

Prior to the pre-disciplinary hearing, Dobos "assumed" that he would be asked questions about the boilers being shut down but "never thought" that disciplinary action would be an

outcome of the meeting, although he did understand it was a pre-disciplinary hearing and stated that he did read the letter listing possible disciplinary outcomes.  Doc. 26-2, p. 69.

Dobos appeared at the hearing with union representatives Heslop and Padisak.  Doc. 26-2, p. 71, 180 (minutes of 2/5 hearing).[4]  According to the minutes, Dobos stated that he had shut down the boilers and had forgotten to turn them back on.  Doc. 26-2, p. 180.  He explained that he had been following up on a classroom leak that he had worked on several weeks earlier.  Id. When asked, he admitted that there was no work order for this leak.  Id.  He did not recall whether he had shut down the boilers when he worked on the leak the first time and admitted that the problem both times was the same.  Id.  When asked if he could have turned off a valve to work on the leak instead of shutting down the boilers, Dobos stated that he did not know but that he did not think so.  Id.  When asked whether he was permitted to work on the boilers, Dobos responded, "I do what is in the best interest of the district."  Id.[5]  Superintendent Spicher commented that insubordination could apply if Dobos was not supposed to be working on boilers and yet chose to do so and Dobos stated, "If that is what you would call it—I don't know—I was just trying to do a good job."  Id.  He did not think it would be a big deal to shut the boilers down for a short time and did not notify any school official that he had shut them down.  Id.  Dobos also admitted that, a few days prior, he may have put water in the boilers if he thought that they needed water even though he had been directed to no longer work on the boilers; "I do whatever I need to do to keep the schools up and running."  Id, p. 181.

---

[4] In his opposition brief, Dobos relies on the minutes to accurately reflect what Superintendent Spicher said and what Dobos said during the February 5 hearing about the boiler issue.  See Doc. 30, pp. 12-13.  At his deposition, Dobos was shown the minutes of the February 5 hearing and was asked whether the minutes accurately captured what was discussed concerning the boiler issue.  Doc. 26-2, p. 71.  Dobos responded, "A lot of this just don't look familiar" and "Boy, I don't recall any of this.  Some of this, yes, I do.  This is almost pretty much the same as the other one."  Id.  Because Dobos relies on the statements made as reflected in the minutes concerning the boiler issue in his opposition brief, the Court also will rely on those minutes.

[5] Dobos was directed to not work on the boilers after he made clear on January 5th that he no longer wanted to have anything to do with the boilers.

Dobos recalls that Superintendent Spicher then asked him about some computer boards that Dobos had purchased on behalf of the school district on three occasions. Doc. 26-2, p. 72, 181. According to Spicher, Dobos stated that he had installed the sink parts somewhere at the school but could not remember where. Doc. 25-1, p. 2, ¶5. The minutes reflect that the Superintendent stated that there were no work orders for the computer boards and asked Dobos to bring all the computer boards to the office before Dobos left for the day so that they could be inventoried. Doc. 26-2, p. 181. Dobos does not recall that the Superintendent told him to bring them to the office "that day." Id., p. 73. He did not bring them to the Superintendent's office that day because he "didn't see a major rush on it. Plus, I got called away." Id. The next day Dobos called off work. Id., p. 75. A few days later he brought boxes containing parts to the office after "Keith called me and said he needed them right away." Id., p. 75.

Thereafter, Dobos was placed on administrative leave. Id., 182 (letter notice). The notice stated,

> This action is being taken as a result of allegations against you which have initiated an active investigation into allegations stated in the pre-disciplinary hearing letter given to you dated February 03, 2016 (copy attached) and any other inappropriate and /or inconsistencies as related to the performance of your job.

Doc. 26-2, p. 182. Dobos understood that he was placed on leave for the boiler issue. Id., p. 78. He did not understand the language cited above with respect to "any other inappropriate and/or inconsistencies as related to the performance of your job" and did not ask anyone what it meant. Id., pp. 78-79.

**F. February 24, 2016, pre-disciplinary hearing**

On February 18, 2016, Superintendent Spicher wrote Dobos a letter informing him that a pre-disciplinary hearing would take place on February 24, 2016. Doc. 26-2, p. 183. The letter stated,

This meeting is being conducted as a result of investigative findings as related to allegations stated in the pre-disciplinary hearing letter dated February 03, 2016 and any other findings as related to the performance of your job.

You will have the opportunity to respond to any findings at the above aforementioned meeting to share your side of events. You will remain on paid administrative leave until further notice and/or pending meeting outcomes.

\*     \*     \*

Depending on hearing results, outcomes may result in the following:
- no formal action being taken
- disciplinary action being taken that may include one or more of the following: verbal reprimand, written reprimand, unpaid suspension, termination
- some other action as accorded and deemed appropriate and/or to include charges filed with local authorities.

Id.

Based on the letter, Dobos believed that the subject of the meeting was going to be the boilers. Doc. 26-2, p. 80. He also understood that he could be disciplined: "I was pretty confident that something was going to happen." Doc. 26-2, p. 80. He understood the last bullet point to be referring to charges that might be filed with local authorities but stated that he was not worried about it; "I just shut the boilers down. I didn't have to worry about that.... I didn't think it was a crime to shut boilers down." Id., p. 81. Dobos stated that, at the time, he was not aware that the school was still looking for the computer boards. Id., pp. 81-82.

According to union representative Padisak, Padisak spoke with Dobos over the phone sometime before the February 24 hearing regarding information he had received from the Board's legal counsel. Doc. 25-2, p. 2, ¶4 (Padisak Affidavit). Padisak told Dobos that, in addition to the boiler issue and insubordination, the Board was concerned about the location of the missing sink parts. Doc. 25-2, p. 2, ¶4. The boxes Dobos had turned over did not contain the missing sink parts and the school wanted to know where the parts were. Id. Padisak advised Dobos to tell the Superintendent where the parts were. Doc. 25-2, p. 2, ¶4. Padisak shared with

Dobos that the Board had the following evidence regarding the missing sink parts: invoices of computer boards that Dobos ordered that remained missing; the boxes he turned over did not include the missing parts; and Dobos's only apparent explanation, that he had installed the parts, was verified to be incorrect because none of the sinks had new parts. Id. Padisak's information about the Board's concern over the sink parts did not come from the Board itself but from the Board's legal counsel. Id.

About a half-hour before the hearing, Dobos met with union representatives Heslop, Rule and Padisak in the bus garage. Doc. 25-2, p. 2, ¶5. Doc. 26-2, pp. 96, 192. Padisak told him that the district was accusing him of theft of washroom sink parts. Id., p. 98; Doc. 25-2, p. 2, ¶5. He told Dobos that if Dobos could not provide information about where the parts were he could face termination and/or criminal prosecution. Id. According to Padisak, he did not tell Dobos that the Board intended to terminate him or press charges because no administrator had told Padisak that that was his or her intent. Id.

Dobos admitted that, as a result of his meeting with the union representatives prior to the February 24th hearing, he understood that the sink parts would be discussed at the hearing. Doc. 26-2, p. 98, 125-126. He understood the detailed accusations Padisak relayed to him regarding the sink parts. Id., p. 126. He understood that Padisak's information was based on his conversation with the Board's legal counsel and not an administrator. Doc. 26-2, p. 107. Contrary to Padisak's recollection, Dobos recalls that Padisak told him that, based on the information from the Board's legal counsel, the Board was going to terminate him immediately and press charges with the local prosecutor if he did not resign that day. Id., p. 106. Nevertheless, Dobos did not think the Board would terminate him. Id., p. 126. He did not intend to resign. Doc. 26-2, p. 126.

During the hearing, according to the minutes, Superintendent Spicher reiterated the facts with respect to the boiler issue. Doc. 26-2, p. 192. He commented that he had verified that, to work on the leak, it was unnecessary to shut down the boilers; a valve could have been turned off instead. Id. He then asked Dobos to provide an explanation for the missing sink parts. Doc. 26-2, pp. 118, 192. He told Dobos that the boxes of parts he produced contained parts that did not match the purchase order or the writing on the boxes and that the company Dobos purchased the parts from had confirmed that they did not match. Doc. 26-2, p. 192. In other words, the computer boards remained unaccounted for. Spicher remarked that there had been no work order requiring computer boards be ordered and they had not been found installed in any of the sinks. Id. Spicher asked Dobos if he could share where the computer boards were or why the boxes contained unmatched parts. Id. Dobos responded,

> SD [Dobos]: I can't really say why they would have shipped those parts in those boxes. You aren't going to believe me anyway.

> KS [Spicher]: I want to believe you and would be happy to see anything you can supply to prove otherwise. If that is the case, when you received the first box and it contained the wrong part, did you question this before ordering additional parts?

> SD: I don't really have an answer for that

> KS: Well—we are at a point where we need evaluate turning this and other concerns over to the prosecutor's office to further investigate and follow through with appropriate outcomes.

> SD: I know—we have other options

> [Padisak]: I already spoke with Scott about this possibility and he was [sic] like to exercise an agreement to resign in lieu of any further investigation by the prosecutor's office and charges being filed.

> KS: we haven't prepared anything at this point, but I will consult with our attorney to draw up appropriate paperwork.

Doc. 26-2, p. 192.  At his deposition, Dobos admitted that he did not provide an explanation or any information regarding the missing sink parts at the hearing.  Doc. 26-2, pp. 118-119.[6]

Dobos alleges that, during the meeting, Spicher raised his voice, called him a liar and a thief, and interrupted him and cut him off when he tried to speak.[7]  Doc. 26-2, pp. 120-122.  Dobos alleges that Spicher told him he could resign or be terminated and have "everything sent to the prosecutor."  Doc. 26-2, p. 105.

According to Padisak, after Dobos did not provide clarifying information regarding the sink parts, Dobos asked to speak with Padisak privately during the hearing.  Doc. 25-2, p. 2, ¶6.  Padisak stated that Dobos was worried that he would be fired and his reputation would be ruined.  Id.  Padisak informed Dobos that Dobos could wait for the Board's decision and then grieve it and Dobos asked how much severance pay he would get if he resigned.  Id.  At Dobos's request, Padisak obtained this information from the administrators and provided it to Dobos.  Id.  Following this, Dobos announced "on his own initiative" that he planned to resign.  Id., ¶7.  Padisak was "shocked" by Dobos's announcement and advised Dobos to take his time to consider his options.  Id.  Dobos agrees that he spoke to Padisak privately during the meeting about resigning.  Doc. 26-2, pp. 109, 126.

Dobos testified that a draft resignation letter had been put at his place even before he announced his intent to resign.  Doc. 26-2, pp. 109-110.  Doc. 26-2, p. 110.  Dobos asked that some language stating that he could still be prosecuted be removed from the letter.  Doc. 26-2, pp. 100, 109.  Spicher left the room to consult with the Board's attorney and returned with a new

---

[6]  At his deposition, Dobos first stated that he did provide an explanation to the Superintendent during the meeting about the missing sink parts but that his explanation was not included in the minutes.  Doc. 26-2, p. 117.  When asked what explanation he provided, Dobos stated, "I would have to assume that from the best of my knowledge, I didn't [provide an explanation]."  Id., p. 118.  He also admitted that he provided no information.  Id., p. 119.

[7] Superintendent Spicher denies these allegations.  Doc. 29-2, pp. 21-22, 31-32.

resignation letter that omitted the prior language regarding potential prosecution.  Id.  The letter

is dated February 24, 2016, and reads,

> To the Howland Board of Education,
>
> I, Scott Dobos, hereby resign my Maintenance II position with the Howland Local School District, effective immediately, for personal reasons.
>
> This resignation letter serves as final and absolute separation from any further relationship with the Board of Education of the Howland Local Schools.

Doc. 26-2, p. 193 (Exhibit O to Dobos Deposition).  Dobos approved this language and signed

the letter.  Id., pp. 100, 193.

No further action was taken by Dobos and, on March 7, 2016, the Board accepted his

resignation.  Doc. 25-1, p. 39.  Dobos did not pursue any post-separation grievance procedures

pursuant to his union's Collective Bargaining Agreement ("CBA").  He filed this lawsuit on

September 27, 2016, alleging that his pre-termination procedural due process rights were

violated.

## II. Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  The movant

"bears the initial responsibility of informing the district court of the basis for its motion,

identifying those portions of the pleadings, depositions, answers to interrogatories, and

admissions on file, together with affidavits, if any, which it believes demonstrates the absence of

a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal

quotations omitted).

After the moving party has carried its initial burden of showing that there are no genuine

issues of material fact in dispute, the burden shifts to the non-moving party.  *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986). "Inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Id.* at 587 (internal quotations and citations omitted). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. The non-moving party must present specific facts that demonstrate there is a genuine issue of material fact for trial. *Id.* at 587. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1986).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A genuine issue for trial exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Muncie Power Products, Inc. v. United Technologies Automotive, Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 248). Thus, for a plaintiff to avoid summary judgment, "there must be evidence on which a jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Accordingly, in determining whether summary judgment is warranted, a judge generally asks "whether there is evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Id.* (citation omitted).

### III. Analysis

The parties agree that Dobos had a property interest in his continued employment and that Defendants were acting at all relevant times under color of state law. Doc. 25, p. 15. In other words, Dobos had a constitutional right to procedural due process prior to his separation. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) (a public employee who has a protected property interest is entitled to due process; he must receive oral or written notice of the

charges against him, an opportunity to respond, and post-termination review); *Farhat v. Jopke*, 370 F.3d 580, 595 (6th Cir. 2004).

The parties dispute whether Dobos's resignation was voluntary and whether he was provided sufficient due process prior to termination.

### A. A genuine issue of material fact exists as to whether Dobos's resignation was voluntary

Defendants argue that Dobos's resignation was voluntary. As a result, they assert, he cannot prevail on a procedural due process claim. In support, they cite *Rhoads v. Bd. of Educ. of Mad River Local Sch. Dist.*, 103 Fed. App'x 888, 894 (6th Cir. 2004) (a public employee is deprived of a property interest if his employer forces him to resign involuntarily, but not if he resigns by his own free will as a result of the employer's actions).

Generally, resignations are presumed to be voluntary. *Id.*, at 895. An employee rebuts this presumption by producing evidence showing that his resignation was involuntary; the question is whether an objectively reasonable person would, under the totality of the circumstances, feel compelled to resign if he were in the employee's position. *Id.* The court considers the following four factors: "(1) whether the employee was given an alternative to resignation, (2) whether the employee understood the nature of the choice she was given, (3) whether the employee was given a reasonable time in which to choose, and (4) whether the employee could select the effective date of resignation." *Id.* (alteration omitted) (quoting *Lenz v. Dewey*, 64 F.3d 547, 552 (10th Cir. 1995). When an employee is forced to choose between resignation and termination, a choice to resign may still be voluntary so long as the employer had good cause to believe that there were grounds for termination. *Id.* An employee's resignation is involuntary, however, if he is not given sufficient time and opportunity to deliberate about the choice.

Dobos argues that he was forced to resign and, thus, his resignation was involuntary. Doc. 30, pp. 26-30. His argument does not follow the four-factor *Rhoads* analysis outlined above; rather, he cites case law from district courts in Connecticut and Illinois for the proposition that a choice to resign under threat of criminal prosecution constitutes involuntary resignation. *Id*., pp. 27-29 (citing *Gorham v. Town of Trumbull Board of Education*, 7 F. Supp. 3d 218, 231-32 (D. Conn. 2014) and *Walsh v. Chicago*, 712 F. Supp. 1303, 1308-1309 (N.D. Ill. 1989)). He also submits that Superintendent Spicher admitted that he did not have enough evidence to implicate Dobos criminally. Doc. 30, p. 29.

Applying the *Rhoads* factors, the Court finds, first, that Dobos was given an alternative to resignation. Rather than resigning, he could have accepted the discipline, including termination; require the Board to prove just cause to terminate him, as it would have to do per the CBA; and then grieve that discipline.[8] *See, e.g., Kirk v. Hockenberry*, 2016 WL 374433, at *5 (S.D.Ohio Feb. 1, 2016) (applying the first *Rhoads* factor: "Plaintiff did have an alternative to resigning—he could have faced termination proceedings" and force the school board to prove they had just cause to terminate him). Second, Dobos understood the nature of the choice he was given. He had extensive conversations with his union representative, Bill Padisak, who informed him of all his options and likely outcomes. Dobos himself testified that he resigned because:

> After talking with Bill, he asked me if I could last for two years without working. He says, "With having a criminal record or going through the criminal process, most companies ask for a background check, police check, and chances are you wouldn't get hired for that because—" that's one reason. And then I'd have to wait another year for the union to try and get my job back.

Doc. 26-2, p. 124. *See also Kirk*, 2016 WL 374433, at *5 (plaintiff "clearly understood the nature of the choice he was given"; by resigning, he foreclosed further criminal inquiry). Thus, the first two *Rhoads* factors weigh in favor of Defendants.

[8] See Doc. 25-1, p. 22, ¶1 (CBA).

The third inquiry under *Rhoads* is whether Dobos was given a reasonable time in which to choose. Taking the facts in the most favorable light to Dobos, Dobos was informed that criminal charges for stealing sink parts was a possible outcome 30 minutes prior to his pre-disciplinary hearing on February 24, when he met with his union representatives.[9] He alleges that Superintendent Spicher told him during the hearing that he had to resign or be terminated and have matters turned over to the prosecutor's office. Doc. 26-2, pp. 105, 127. Dobos stated that a resignation letter was sitting in front of him at the hearing. Doc. 26-2, pp. 109-110. He announced that he would like to resign during the meeting after the issue of the missing sink parts was raised and, after striking a portion of the resignation letter and waiting for it to be re-typed, he signed and returned the resignation letter. This was not a reasonable time in which to choose. *C.f. Kirk*, 2016 WL 374433, at *5 (the plaintiff had a reasonable time to choose because he did not sign the resignation letter when the defendants presented it to him; instead, he took the letter home, discussed the issue with his wife, asked follow-up questions, and, after consideration, signed and returned the letter a few days after receiving it); *Rhoads*, 103 Fed. App'x at 895 (seven hours to decide was a reasonable time). Moreover, Dobos had previously requested that his wife be permitted to attend the hearing but his request was denied. Doc. 27, p. 76. These facts weigh in favor of Dobos.

On the other hand, Padisak stated that, when Dobos announced that he wanted to resign, Padisak advised Dobos to take his time. Doc. 25-2, p. 2, ¶7. That Dobos chose to ignore Padisak's advice does not establish that Defendants gave Dobos an unreasonable amount of time to choose. Given all the foregoing, and taking the facts in the most favorable light to Dobos, the third *Rhoads* factor weighs in favor of Dobos.

---

[9] Although Padisak stated that he also spoke to Dobos over the phone before the hearing on February 24, neither Padisak nor Dobos state precisely when this phone call occurred.

As for the fourth *Rhoads* factor, the evidence is equivocal regarding whether Dobos could select the effective date of resignation. Padisak stated, "Nobody made any suggestions that a resignation must be effective that day." Doc. 25-2, p. 2, ¶7. The resignation letter, dated February 24, stated that Dobos's resignation was "effective immediately." Doc. 26-2, p. 193. The letter was drafted by both parties; although it was initially presented to Dobos by Defendants, Dobos struck language that he found objectionable and Defendants acquiesced in striking that language. Dobos did not testify that he requested that the effective date be changed. Moreover, it is undisputed that Dobos's resignation had to be acted on by the Board before it became effective (Doc. 26-2, p. 128), and the Board did not meet until 12 days later, on March 7, 2016. Doc. 25-1, p. 2, ¶7.

Finally, a choice to resign may be voluntary so long as the employer had good cause to believe that there were grounds for termination. *Rhoads*, 103 Fed. App'x at 895. Dobos argues that Superintendent Spicher stated that he was not convinced that there was enough evidence to potentially implicate Dobos criminally. Doc. 30, p. 29; Doc. 27, pp. 43-44. That Spicher did not think that there was enough evidence to potentially implicate Dobos criminally does not answer the question whether Spicher had good cause to believe that there were grounds for termination. However, Spicher also testified that he had not intended to terminate Dobos at the February 24th hearing but was only going to place him on paid leave and then, if there was more information that needed explaining, he would hold an additional hearing. Doc. 27, p. 44. In other words, Spicher did not testify that he had good cause to believe there were grounds for termination.

In sum, the third *Rhoads* factor weighs in favor of Dobos as does the question whether the employer had good cause to believe that there were grounds for termination. Thus, a genuine issue of material fact exists as to whether Dobos's resignation was voluntary or involuntary,

precluding judgment as a matter of law on that issue. Therefore, the Court will proceed to the question whether Dobos was provided sufficient due process.

### B. Dobos was provided sufficient pre-termination due process

Dobos argues that he was denied procedural due process prior to his termination. He argues that Defendants failed to notify him in advance that he was being accused of stealing sink parts; failed to allow him an opportunity to respond to the evidence that they gathered; and forced him to choose between resignation or termination with criminal prosecution. Doc. 20, p. 22. Defendants submit that Dobos had adequate due process as required by *Loudermill*: he had notice of the charges, an opportunity to respond, he was given a pre-termination hearing, and he had post-deprivation procedures available to him. Doc. 25, p. 21; Doc. 31, p. 15.

### 1. Dobos had adequate notice of the charges

*Loudermill* requires that an employee be provided with oral or written notice of the charges against him and an explanation of the employer's evidence. 470 U.S. at 546. Dobos complains that the letters dated February 3 and 18 that Defendants sent him directing he attend pre-disciplinary hearings did not mention sink parts. Doc. 30, p. 24. In other words, he complains that he did not have written notice of the charges. But Dobos had oral notice of the charges and an explanation of the Board's evidence. Dobos admitted that he knew the school was looking for the missing sink parts since December 21, 2015, when Keith asked him about the latest invoice and questioned why he kept ordering the same parts. He was questioned at the February 5th hearing about the parts he had ordered and was directed to produce them. Prior to the February 24th hearing, Padisak told Dobos that the Board was accusing him of stealing sink parts and advised Dobos to tell Spicher where the parts were. Padisak shared with Dobos the evidence the Board had: the parts Dobos produced did not match either the invoices from the missing parts that Dobos had ordered or the boxes the parts were produced in and they had not

been found installed in any sinks, contrary to what Dobos had previously stated.  Dobos admitted

that he understood that sink parts would be discussed at the February 24th hearing and he

understood the accusations detailed by Padisak prior to the hearing.  And Spicher recounted the

same evidence during the hearing.

In other words, Dobos was provided with oral notice of the charges against him and an

explanation of the employer's evidence.  *See Loudermill*, 470 U.S. at 546; *Abel v. Auglaize Co.

Highway Dept.*, 276 F.Supp.2d 724, 738 (N.D.Ohio 2003) (rejecting plaintiff's argument that he

was denied due process because the defendants set forth the specific charges against him at the

hearing and not in its prior letter: "There is no constitutional right to know the specific charges

prior to a pre-disciplinary hearing.").

Dobos argues that his due process rights were violated because the Board did not present

him with the actual evidence and cites *Lane v. Pickerington*, 588 Fed. App'x 456 (6th Cir. 2014),

in support.  In *Lane*, the Sixth Circuit found that the employee plaintiff was denied adequate pre-

termination due process because he was denied a chance to view the evidence against him and an

issue of fact existed as to whether he was given notice of all the charges.  *Id*. at 465-466.  Lane

was accused of having pornographic images on his computer over four years prior to the images

being discovered.  *Id*., at 459.  At his pre-disciplinary hearing, Lane denied having pornography

on his computer and asked to see the images, but his request was denied.  *Id*.  The Court found

that, due to the stale nature of the evidence and the fact that Lane asked to view the evidence but

was not permitted to, he was denied adequate pre-termination process.  *Id*., at 464, n. 7; 459, n.

2.[10]  Here, in contrast, the evidence against Dobos was more recent and he does not deny

---

[10]  The Court also found an issue of fact as to whether Lane had adequate notice of all charges because, at his pre-
deprivation hearing, he was told that there were allegations of sexual harassment and the defendant mentioned
Lane's alleged conversation to a coworker about masturbation. 588 Fed. App'x at 465, n. 9.  Lane responded that he
did not "even talk to those girls" and informed the defendant that any allegations of sexual harassment needed to be
on the pre-disciplinary notice.  *Id*.  The Court observed that the defendant thereafter stated in memoranda to the
State of Ohio and the Bureau of Unemployment that Lane "created a hostile working environment that makes the

knowledge of the evidence. Dobos admitted that he ordered and received the parts within the last year and that he had just ordered three of the parts in November 2015. A month later (and two months prior to his final pre-disciplinary hearing) Keith referenced the November 2015 invoice and asked Dobos where the parts were. Dobos admitted that he knew the school was looking for the parts since December 2015. Finally, unlike the plaintiff in *Lane*, Dobos did not ask to see the invoices or any other evidence. Dobos's reliance upon *Lane* is unavailing.

### 2. Dobos had an opportunity to respond

Dobos argues that he did not have a meaningful opportunity to respond because he claims that Defendants "ambushed" him at the February 5th hearing and he was not able to properly prepare. Doc. 30, pp. 24-25. But Defendants did not accuse Dobos of stealing roughly $2,900 in sink parts at the February 5th hearing; they simply asked him where the parts were because they remained unaccounted for. This was a question Dobos admits he was previously asked by Keith in December but that he had not answered. At the February 5th hearing he was told to bring the parts to Spicher's office. Thus, Dobos had an opportunity to respond at the February 5th hearing, and Defendants gave him time to produce the parts.

Dobos alleges that he "had no idea" that the sink parts would be the "primary focus of the disciplinary meeting" on February 24th because sink parts weren't mentioned in the February 18th letter. But Dobos was well aware that sink parts would be discussed at the February 24th hearing because his union representative told him so prior to the hearing. Next, Dobos asserts that he did not have "an opportunity to prepare" for the sink parts issue. But *Loudermill* does not require an "opportunity to prepare"; it requires notice and an "opportunity to be heard." 470

---

women feel uneasy when [he] is present" and "made comments about masturbation to a female employee, made an alleged sexual comment to another employee about her breasts, was allegedly changing his pants in his office with the door open, and allegedly invaded female employees' personal spaces by walking right up to them or behind them." *Id*. In other words, the defendant referenced allegations that, it is undisputed, were never presented to Lane. That is not the case here.

U.S. at 545-546 (the pre-termination hearing "need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action."); *see also Lusher v. City of Mansfield*, 2007 WL 756655, at *7 (N.D.Ohio March 8, 2007) ("[A] pre-termination hearing is merely 'an initial check' against mistakes. Thus, the critical inquiry at this early stage is whether the charges are accurate and the employee understands them, not whether the employee has had a sufficient amount of time to fully prepare for an adversary-type hearing.").

The evidence shows that Dobos had an opportunity to be heard at the February 24th hearing, as well as during the time period prior to the hearing when he had been asked to identify the location of the sink parts and/or produce the sink parts and he did neither. The facts in this case show that Dobos had plenty of time to prepare and an opportunity to respond to the school's questions regarding expensive sink parts that he had ordered and that appeared to be missing, but that he simply chose not to respond.[11]

### 3. Dobos had post-deprivation procedures available

Procedural due process requires "the *opportunity* for a post-deprivation hearing before a neutral decisionmaker[.]" *Farhat*, 370 F.3d at 596 (emphasis in original). "[G]rievance procedures provided by a collective bargaining agreement can satisfy a plaintiff's entitlement to post-deprivation due process." *Id.*; *see also Buckner v. City of Highland Park*, 901 F.2d 491, 494-495 (6th Cir. 1990). Defendants assert that the CBA in this case provided for robust post-

---

[11]  During his deposition, Dobos, when asked, provided an explanation for the missing sink parts; to wit, he stated that he did not order five computer boards. He ordered one computer board and then he ordered four sensors because he had been told by the supplier that the computer boards had been discontinued and that four sensors would be needed to replace one computer board. Doc. 26-2, pp. 87-89. Thus, he ordered four sensors to keep in stock in case a computer board broke. Doc. 26-2, p. 87. It is not clear whether Dobos installed the computer board that he ordered or if he kept it to have in stock. Doc. 26-2, pp. 84-85.

termination process, including a post-deprivation hearing before a neutral decisionmaker. Doc. 25, p. 26; Doc. 25-1, p. 9.

Dobos does not dispute that (1) the CBA generally provides an adequate post-deprivation process; and (2) he failed to grieve his alleged involuntary resignation or constructive discharge. Dobos contends that the CBA's post-deprivation process was not available to him because the CBA's definition of "discipline" does not "include" the "concept of forced resignation or constructive discharge." Doc. 30, p. 35. Dobos's argument is unavailing. First, the CBA does not define "discipline"; therefore, it is inaccurate to say that the CBA omits forced resignation or constructive discharge as "discipline." Second, Dobos did not attempt to grieve his alleged constructive discharge; thus, he lacks evidence showing the CBA would not permit him to grieve an alleged constructive discharge.

Dobos's assertion that he was unaware he could grieve his alleged constructive discharge and his attendant complaints regarding what his union representative allegedly told him (Doc. 30, pp. 34-35) does not describe how <u>Defendants</u> violated his due process rights. Finally, Dobos contends that the CBA does not allow an employee to both grieve his discipline and file a federal lawsuit. Instead, Dobos submits, an employee must elect remedies. Doc. 30, p. 35. He cites the following passage from the CBA in support:

> A grievant will not be denied his/her legal rights under the law; provided however, if a cause of action on the same issue is brought in a court of law during the pendency of a grievance, the procedure shall be immediately terminated and the relief requested denied.

Doc. 30, p. 35 (citing Doc. 27, p. 102). This passage does not state that an employee must elect between grieving a discipline and filing a lawsuit. Rather, it states that an employee may not do both of these things at the same time. Dobos has not shown that Defendants failed to provide him with adequate post-deprivation procedures.

In sum, the pre-termination process that Dobos received comports with the constitutional requirements set forth in *Loudermill*, including an opportunity for extensive post-deprivation procedures. Accordingly, Defendants are entitled to judgment as a matter of law on Dobos's claim that Defendants denied him procedural due process rights.

### C. Superintendent Spicher is entitled to qualified immunity

Dobos brought a claim against Spicher in his individual capacity. Doc. 1, p. 2, ¶8. Defendants assert that Spicher is entitled to qualified immunity. Doc. 25, p. 27. "Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (internal quotation marks omitted). As explained above, Spicher did not violate Dobos's constitutional right to procedural due process. Accordingly, Spicher is entitled to qualified immunity.

### IV. Conclusion

For the reasons explained above, Defendants' Motion for Summary Judgment is GRANTED.


IT IS SO ORDERED.


Dated: January 23, 2018

_____
Kathleen B. Burke
United States Magistrate Judge